IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCHOOL DISTRICT OF THE CITY OF ERIE | : | |
| and BUTLER COUNTY GENERAL | : | |
| AUTHORITY, | : | NO. _____ |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| J.P. MORGAN CHASE BANK, INVESTMENT | : | |
| MANAGEMENT ADVISORY GROUP, INC., | : | JURY TRIAL DEMANDED |
| MARTIN J. STALLONE, MICHAEL GARNER, | : | |
| ROBERT W. JONES and DAVID DiCARLO, | : | |
| Defendants | : | FILED ELECTRONICALLY |

## COMPLAINT

## PARTIES

1.      Plaintiff School District of the City of Erie ("Erie School District") is a duly

constituted local government unit in the Commonwealth of Pennsylvania with its

principal office at Washington Education Center, 148 West 21st Street, Erie, PA 16502.

2.      Plaintiff Butler County General Authority ("Butler County General

Authority") is a public instrumentality and body corporate and politic in the

Commonwealth of Pennsylvania with its principal office at 222 South Main Street,

Butler, PA 16001.

3.      Butler County General Authority is a Plaintiff because of its involvement as

essentially a pass through entity as a party to the swaption transaction involved in this

matter.  At all times, Erie School District was and is the real party in interest in the

matters set forth in this Complaint and the party that sustained the ultimate compensatory injuries and damages as a result of this transaction.

4.     Defendant J.P. Morgan Chase Bank ("J.P. Morgan") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, NY 10017-2270.

5.     Defendant Investment Management Advisory Group, Inc. ("IMAGE"), is a Pennsylvania corporation with its principal office at 886 Vaughn Road, Pottstown, PA 19465.

6.     Defendant Martin J. Stallone is an adult individual believed to reside at 1326 Monroe Avenue, Reading, Berks County, PA  19610.  Defendant Stallone, at all times relevant to this Complaint, has been and is the managing director and employee of IMAGE.

7.     Defendant Michael Garner is an adult individual believed to reside at 1107 Middleton Place, Eagleville, Montgomery County, PA  19403.  At all times relevant to this matter, Michael Garner was a principal and employee of IMAGE.  Defendant Garner left IMAGE on November 16, 2007.

8.     Defendant David DiCarlo is an adult individual residing at 4574 Walten Woods Drive, Erie, Erie County, PA  16511.

9.     Defendant Robert W. Jones is an adult individual believed to reside in the Commonwealth of Pennsylvania but his address is not currently known to Plaintiffs.  At all relevant times, Defendant Jones was a principal, employee and managing director of IMAGE.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists in the United States District Court for the Western District of Pennsylvania pursuant to the 28 U.S.C. §§ 1331 and 1337 because this action arises under the laws of the United States.  Supplemental jurisdiction exists over other claims pursuant to 28 U.S.C. § 1367(a).

11.     Both general and specific personal jurisdiction over all Defendants exists in this District.  All Defendants have purposely availed themselves of the benefits of doing business in this forum; all Defendants have engaged in acts in the forum state related to the subject matter of this action; and exercising personal jurisdiction over all Defendants in this forum comports with traditional notions of fair play and substantial justice.

12.     Venue exists in this District pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

13.     This action arises out of a fixed-for-floating rate swaption transaction (hereinafter the "Swaption") entered into between J.P. Morgan and Butler County General Authority dated as of September 17, 2003 and conduct of Defendants leading up to that transaction.  A true and correct copy of the Swaption is attached as Exhibit "A."  Exhibit "A" includes the ISDA Master Agreement dated as of September 17, 2003 (the "Master Agreement"), the Schedule to the Master Agreement dated September 17, 2003 and the Swaption Confirmation dated September 4, 2003.  Attached as Exhibit "B" is a copy of the Loan Agreement between Butler County General Authority and Erie

School District dated as of September 17, 2003 that was entered into as part of the Swaption.

14.     Under a generic swaption structure, the counter-party and issuer of the swaption agree on the strike rate, length of the option period (which usually ends on the starting date of the swap if swaption is exercised), the term of the swap, notional amount, amortization, and frequency of settlement. The swaption gives the counter-party the right, but not the obligation, to pay (or receive) a fixed rate on a given date and receive (or pay) a floating rate index. It is designed to give the holder the benefit of the agreed upon strike rate if the market rates are higher, with the flexibility to enter into the current market swap rate if they are lower; the converse is true if the holder of the swaption receives the fixed rate under the swap agreement. If the strike rate of the swap is more favorable than the prevailing market swap rate then the swaption will be exercised by the counter-party and the customer enter into an interest rate swap as detailed in the swaption agreement. Unlike ordinary swaps, a swaption not only hedges the counter-party against downside risk, it also lets the counter-party take advantage of any upside benefits. Like any other option, if the swaption is not exercised by maturity it expires.

15.     Under the Swaption, J. P. Morgan was the counter-party and designated to pay the fixed rate, which was based on the interest rate schedule for the 2000 Bonds (as hereinafter defined) and Butler County General Authority, as agent of Erie School District, was the issuer and designated to pay the floating rate, which was based on USD-LIBOR-BBA.

16.     At all times relevant to the matters set forth in this Complaint, Defendant David DiCarlo was the duly authorized employee and agent of J.P. Morgan acting within the course and scope of his authority, including all of his representations and statements made to Plaintiffs and their representatives in regard to the Swaption.

17.     At all times relevant to the matters set forth in this Complaint, Defendants, Garner, Stallone and Jones were the duly authorized employees and agents of IMAGE acting within the course and scope of their authority, including all of their statements and representations made to Plaintiffs and their representatives in regard to the Swaption.

18.     Prior to September 2003, a unit of Pennsylvania local government like the Erie School District was *not* permitted to enter into a swaption transaction.  Beginning in September, 2003, a local government unit *was* authorized to enter into a swaption agreement *provided that* the transaction complied with the terms and provisions of Pennsylvania law, including provisions designed specifically for the protection of the local government unit and to insure the integrity of the transaction..

19.     Pursuant to the 2003 amendments to the Local Government Unit Debt Act (hereinafter, the "2003 Debt Act Amendments"), the local government unit involved in a swaption must select

> The qualified interest rate management agreement which the local government unit determines is in its best financial interest.  The qualified interest rate management agreement selected must contain financial terms and conditions which in the opinion of the independent financial advisor to the local government unit are fair and reasonable to the local government unit as of the date of award.

53 Pa. C.S. § 8281(c)(4).  This requirement may be met by obtaining "a finding from an independent financial advisor to the public authority that the financial terms and conditions of the agreement are fair and reasonable to the public authority as of the date of the award…."  53 Pa. C.S. § 8281(c)(5).

20.    Under the statute, the independent financial advisor may not be a party to the agreement or an affiliate or agent of the other party on a qualified interest rate management agreement with respect to which the independent financial advisor is advising the local government unit.  53 Pa. C.S. § 8002.

21.    Upon information and belief, one or more of Defendants J.P. Morgan, IMAGE, Stallone, Garner, Jones and DiCarlo were involved in the structuring of, and/or lobbying for passage of, the 2003 Debt Act Amendments.

22.    Upon information and belief, the knowledge, reputation, sophistication and experience of J.P. Morgan in the structuring of swaptions and the particulars of the 2003 Debt Act Amendments was so extensive that J.P. Morgan was viewed at the time as, and was in fact, a "market maker" for derivative investments by Pennsylvania local governmental units.

23.    J.P. Morgan, through Defendant DiCarlo, recommended that the Erie School District retain IMAGE as its independent financial advisor in order to permit the transaction to comply with the 2003 Debt Act Amendments.

24.    In his meetings with the Erie School District Board of Directors, Defendant DiCarlo, on behalf of J.P. Morgan, spoke highly of IMAGE and represented to the Board that there were only three or four firms in the world that were situated to provide the

expertise required of independent financial advisor to a local government unit as required under the 2003 Debt Act Amendments and "IMAGE is probably the premiere firm that acts as a financial advisor on these deals."

25.     In reliance on the recommendations of Defendant DiCarlo,  and IMAGE's representations as to their qualifications to serve Erie School District, Erie School District retained IMAGE as their independent financial advisor.

26.     At all times relevant to this matter, Defendant J.P. Morgan and its representative, Defendant DiCarlo, and IMAGE and its representatives, Defendants Stallone, Garber and Jones, represented to Erie School District that they had, and did in fact have, superior knowledge relating to:  (i) the terms and provisions of the 2003 Debt Act Amendments in general and in particular the legislative rationale for the independent financial advisor requirement; (ii) the financial intricacies and the sophisticated nature of the market for swaptions including the instant Swaption; and (iii) understanding and calculating market spreads and  fees that would be received by a party in the position of J.P. Morgan on a swaption of the type at issue in this matter, including the specific Swaption attached as Exhibit "A."

27.     At all times relevant to this matter, Defendant J.P. Morgan and its representative, Defendant DiCarlo, and IMAGE and its representatives, Defendants Stallone, Garber and Jones knew that Erie School District, its agents, and Board members had only rudimentary, laymen's' understanding of the nature of the market for swaptions including the instant Swaption and that they were relying *solely* on the Defendants' representations and on IMAGE's expertise to evaluate same and to

understand and calculate market spreads and fees that would be received by J.P. Morgan on the Swaption.

28.     Based on information and belief, Erie School District avers that J.P. Morgan and IMAGE were involved in a collusive arrangement in the market for Swaptions that included the period of time leading up to and through September 17, 2003.

29.     Based on information and belief under the collusive arrangement, J.P. Morgan and IMAGE were engaged in anti-competitive conduct in the area of municipal derivatives, including swaptions.

30.     Based on information and belief under the collusive arrangement, J.P. Morgan intended to procure for itself and did procure for itself in many instances, excessive transaction fees and/or market spreads on transactions of the type at issue in this matter, specifically including the transaction at issue.  Based on information and belief, the IMAGE and the individual Defendants had knowledge of the foregoing anti-competitive collusive conduct and participated in it.

31.     Based on information and belief under the collusive arrangement, J.P. Morgan exploited its reputation for expertise on transactions of the type at issue in this matter,  and specifically in this case the trust engendered by Defendant DiCarlo's history of dealings with Erie School District,  to arrange for the engagement by the issuer of "experts" (in this case IMAGE) that it knew, or had reason to expect, would not be "independent" as that term is used in the 2003 Debt Act Amendments.

32.     Under the collusive arrangement, IMAGE was aware that its ability to be engaged by local government units, such as Erie School District, and to profit from such engagements was dependant on maintaining a relationship with referral sources such as J.P. Morgan, and determined (with J.P. Morgan's knowledge) therefore either (i) knowingly to support the financial structures of swaption transactions such as the Swaption or (ii) consciously to avoid investigating those structures as was its duty under contract and under the 2003 Debt Act Amendments.

33.     At no time did J.P. Morgan or its agents and employees or IMAGE or its agents and employees, including the individual Defendants, disclose to Erie School District or Butler County General Authority that the two entities were working under a collusive arrangement as set forth above.

34.     Erie School District and its representatives did not become aware of the excessive fees and/or market spread received by J.P. Morgan under the transaction attached as Exhibit "A" until October 5, 2007 when one of its representatives was contacted by *Bloomberg News*.  In March 2008, Erie School District first became aware of information relating to the collusive activity.

35.     The collusive, anti-competitive activity between J.P. Morgan, IMAGE and other providers and brokers of municipal derivatives, including swaptions, has been and is being investigated by the United States Department of Justice, Anti-trust Division, the Internal Revenue Service and the Securities and Exchange Commission.  It is also the subject of a class action filed in the United States District Court of the District of

Columbia to Civil Action No. 1:08-CV-00432. Plaintiffs had no knowledge of the collusive activity until March, 2008.

36.     Based on information and belief, Erie School District avers that J.P. Morgan and IMAGE, as part of the larger collusion/market manipulation scheme, and acting by and through the individual Defendants, conspired together to have IMAGE appointed as financial advisor to the Erie School District with respect to the transaction at issue, with the understanding that IMAGE would not provide an independent review of J.P. Morgan's pricing, or would not undertake the required due diligence to determine J.P. Morgan's pricing or would not disclose J.P. Morgan's pricing, even though IMAGE and Defendants Stallone, Garner and Jones either could readily determine the pricing or in fact knew the pricing. Such conspiracy circumvented certain laws of the Commonwealth of Pennsylvania by undermining the independent review requirements of the 2003 Debt Act Amendments.

37.     Under the swaption, the Erie School District received a cash payment of $755,000 in exchange for granting J.P. Morgan the right, but not the obligation, to exercise the swaption and thereby to enter into a fixed-for-floating interest rate swap as outlined in Exhibit "A" with Butler County General Authority, as agent of Erie School District at any time between 2011 and 2021.

## COUNT I – SECURITIES FRAUD
### (Plaintiffs v. All Defendants)

38.     Paragraphs 1 through 37 are incorporated by reference.

39.     The Swaption Agreement as set forth above constitutes a security based swap agreement pursuant to the Gramm-Leach-Bliley Act ("GLB Act") signed into law on December 21, 2000.  As such, the Swaption falls within the scope of the securities fraud provisions under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

40.     Erie School District has standing to assert this securities fraud claim in violation of Section 10(b), 15 U.S.C. § 78(j)(b)(2000) and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5(2001).

41.     Under Section 10(b), it is unlawful for any person:

> To use or employ, in connection with the purchase or sale of any…
> security-based swap agreement  … any manipulative or deceptive device
> or contrivance in contravention of such rules and regulations as the
> [Securities and Exchange] Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

42.     Pursuant to Rule 10b-5:

> It shall be unlawful for any person, directly or indirectly, by the use
> of any means in instrumentality of interstate commerce, or of the mails or
> of any facility of any national securities exchange,
>
> (a)     To employ any device, scheme or artifice to defraud,
>
> (b)     To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statement made, in
> the light of the circumstances under which they were made, not
> misleading, or
>
> (c)     To engage in any act, practice or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(2001).

43.     Under the foregoing provisions of Section 10(b) and Rule 10b-5:

Any person or entity, including a lawyer, accountant or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994); cited in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., ___ U.S. ___, ___; 128 S.Ct. 761 (2008).

44.     Under the foregoing statute, Rule and Supreme Court decisions, all Defendants are primary violators under 10b-5 because all of the requirements for primary liability are met as to each Defendant.

45.     At a Board meeting of the Erie School District Board of Directors in June 2003, Defendant DiCarlo, on behalf of J.P. Morgan and being authorized to do so, presented to the Board an opportunity which he claimed existed that would allow the Erie School District to generate about $1.5 million in savings through a swaption with J.P. Morgan that would operate as a "synthetic refunding" of the Erie School District's 2000 series bond issue (the "2000 Bonds").  Upon information and belief, the 2000 Bonds could not be refunded at the time under a standard transaction due to applicable Treasury Regulation restrictions.

46.     Defendant DiCarlo held himself out to be a trusted advisor to the Erie School District and had for 20 years represented the Erie School District on multiple refunding issues while he was a principal in his prior company, RRZ Public Markets, Inc. ("RRZ").  Upon information and belief, RRZ was one of several financial institutions that participated in the structuring of the 2000 Bonds.  Upon information and belief, J.P.

Morgan was a successor in interest to RRZ by merger, consolidation, acquisition or similar transaction. In that meeting, DiCarlo represented that he was bringing the opportunity to Erie School District as one of his "responsibilities" to the District. Defendant DiCarlo had a course of dealing with the Erie School District (and, upon information and belief, other Pennsylvania school districts) whereby he would monitor bond rates and, as the markets allowed savings to be realized, on his own initiative approach the Erie School District with refunding proposals.

47.     After the June Board meeting presentation, Defendant DiCarlo, as representative of J.P. Morgan, met with various other individuals and members of the Board.

48.     As set forth above, Defendant DiCarlo recommended that the Board utilize the services of IMAGE as the statutorily required independent financial advisor to the School District.

49.     Defendant DiCarlo met with the Erie School Board members again on September 4, 2003. At that meeting, Defendant DiCarlo told the Board that interest rates had gone up from a "historic" low (due in part to the delay in the transaction necessitated by the timing of passage of the 2003 Debt Act Amendments) and, that as a result, the amount of money (savings) that could be realized through the "synthetic refunding" to be effectuated by the Swaption was only $750,000.

50.     At the September 4, 2003 meeting, Defendant DiCarlo also discussed fees and/or market spread that would be received by various entities, including IMAGE and J.P. Morgan. For all these except J.P. Morgan, Defendant DiCarlo presented

specific fee information.  The specific information included an advisory fee of $60,000 to IMAGE for "a non-biased overview of the transaction."  The latter statement was false because Defendant DiCarlo knew, or had reason to know,  that IMAGE was not providing a "non-biased overview of the transaction."

51.     It also included a fee for J.P. Morgan as the paying agent trustee in the amount of $15,000.  This $15,000 did not include the fees and/or market spread J.P. Morgan would receive for entering into the Swaption.

53.     J.P. Morgan, IMAGE, and the individual Defendants had full knowledge of the sophisticated nature of this market for swaptions and specific knowledge that the fees and/or market spread that would be received by J.P. Morgan were readily capable of calculation by sophisticated entities involved in the market, such as J.P. Morgan, IMAGE and the individual Defendants.

53.     The Board made known to Defendant DiCarlo that it wanted to know the total fees and/or market spread that would be received by J.P. Morgan and that this information was material to the Board.  Defendants Garner, Stallone and Jones also knew the Board wanted to know this material information.

54.     Defendant DiCarlo stated as follows as to "the last and the more important thing is everybody has asked and it is a reasonable question, what does J.P. Morgan, what do we get on this transaction."  In answering the question, which he acknowledged was of great importance to the Board, Defendant DiCarlo stated as follows:

> I can't quantify that to you.  This is not a bond underwriting where we go and we can say the discount is .75% of the 1%.  That's not the case. What this is, is a financial transaction that is put into a huge hedge fund that J.P. Morgan controls.  There's a trillion dollars of investments in that

hedge fund. Executing this contract and the School District is betting that interest rates are going to continue to rise, there's some other issuer in Tokyo or somewhere else who's got an opposite bet that interest rates are going to be lower and they're going to offset each other in this hedge fund. To simplify it, I guess when you go to the bank to get a mortgage, you have the legal fees and everything else but you can't quantify what the bank is going to make because they don't know what they're going to make. They lend the money out as an interest rate, they put that money in their pool of money and whatever they make, they make. So again, it is not a typical underwriting and I can't quantify that for you and there's no way that I can be specific on that. If we were still RRZ public markets we couldn't do this transaction for you because we don't have the financial strength or the capability to do that. But now that we are J.P. Morgan Securities, it's a product and it's something when I came to you in June, I said yes, this new firm that we're with, they're one of the largest banks in the world. Here's an opportunity that's available. That's what it's about. I can only tell you in Pennsylvania alone, we've probably done about four billion dollars worth of these transactions just in the Commonwealth of Pennsylvania.

55.    In response to a question from Board member Tucker, who asked whether the fee would be "based on a percentage, a flat rate, or what", Mr. DiCarlo stated as follows:

Mr. DiCarlo said it's put into this huge fund and when I say it's a trillion dollars it is a trillion dollars and we don't even know if this contract is going to be executed until 2011. We're giving you this $750,000 today based on something that would be predicted years from now. We're risking that premium. We may lose money on the transaction. All I can say, this transaction was on this side, there's another transaction that's betting the opposite will happen on the other side. It's a flow of funds. A bond issue, I could say to you this is the cost, this is the fixed rate. I can't do that on this.

56.    Defendant DiCarlo's statements set forth above, which statements were made on behalf of and as the authorized agent and/or an employee of J.P. Morgan, were false and misleading as to the material information regarding the fees and/or market spread that would be received by J.P. Morgan. The statements that he did not

know the fees and/or market spread that would be received by J.P. Morgan on the transaction, that the fees and/or market spread to be received by J.P. Morgan could not be calculated because of the complexity of the market, that J.P. Morgan may lose money on the transaction, that he could not quantify the for the Board and "there's no way" that he could be specific on the fees and/or market spread to be realized by J.P. Morgan were all false and misleading. J.P. Morgan and Defendant DiCarlo knew at the time he made these statements that his statements were false. Defendant DiCarlo made the false and misleading statements with the intent of deceiving and misleading the Board.

57.     Contrary to Defendant DiCarlo's statements, J.P. Morgan and Defendant DiCarlo knew the total fees and/or market spread that J.P. Morgan would receive upon consummation of the transaction and that J.P. Morgan's fees and/or market spread was not uncertain or incapable of being quantified for the Board.

58.     Defendant DiCarlo's false statements set forth above with respect to the fees and/or market spread of J.P. Morgan were made in order to induce the Board to enter into the transaction and the statements, together with the statements by Defendants Stallone, Garner and Jones, did in fact induce the Board to enter into the Swaption. Defendant DiCarlo and the other individual Defendants and IMAGE knew that if the true fees and/or market spread to be received by J.P. Morgan had been disclosed to the Board, the Board never would have entered into the transaction.

59.     When Defendant DiCarlo made these false statements, he knew based upon J.P. Morgan's collusive arrangement with IMAGE that IMAGE would support these

statements in its opinion to the Erie School District, and IMAGE did so.  But for such collusive arrangement, defendant DiCarlo's false statements would have been revealed as false, and the transaction would not have proceeded.

60.    During the Board meeting on September 4, 2003 the Board requested specific input from representatives of IMAGE before committing the School Board to the transaction.

61.    Defendants Garner and Stallone, duly authorized employees and agents of IMAGE, participated in a conference call on September 4 with the School Board and Defendant DiCarlo as part of the School Board meeting.

62.    On behalf of IMAGE, Defendant Stallone stated to the Board, on behalf of IMAGE, that part of IMAGE's responsibility was to "give you comfort that the swaption and the amount of up front premium that's being paid to you is a fair market price for this transaction."

63.    Defendant Stallone went on to state that "the premium that J.P. Morgan is offering to pay for you is on market price for the type of swap and the way that it is currently structured."  Defendant Stallone further stated that "we've been involved in probably billions of dollars of these [swaptions] just here in Pennsylvania and your structure is consistent with the way those other swaps have been structured for other Pennsylvania municipalities."

64.    Defendants Stallone, Garner, Jones and IMAGE knew that the School District would receive only $755,000 from the swaption and either knew, or were reckless in not determining that J.P. Morgan would receive fees and/or market spread in

excess of $1,200,000. Despite having this knowledge, or recklessly failing to acquire this knowledge, Defendants Stallone and Garner in the conference call recommended that Erie go forward with the transaction and stated that they would be sending a follow-up letter indicating that "the swaption was entered into at a fair price" and that the fees included in the transaction are based upon a fair market price as well. The follow-up letter is the September 17, 2003 letter attached as Exhibit "C" and discussed below.

65.     At the time Defendant Stallone made the foregoing statements to the Board, Defendants DiCarlo, Stallone and Garner all knew that the statements were false or were reckless in their disregard for their truth or falsity. Defendants Garner and DiCarlo did not in any way correct the false statement made by Defendant Stallone. The statements were made as part of the collusive, anti-competitive arrangement and conspiracy between Defendants as set forth above and were intended to, and did in fact, deceive Erie School District and induce it to enter into the transaction at exorbitant, inflated, unfair fees and/or market spread for J.P. Morgan.

66.     IMAGE and its representatives, Defendants Stallone and Garner, knew that the Swaption was not fair and reasonable to Erie School District as of the date of the award or were reckless in not acquiring the appropriate knowledge needed to evaluate the fairness and reasonableness of the transaction as was their duty.

67.     In addition to the statements made in the meeting, Defendant, Robert W. Jones, as managing director for IMAGE, sent a letter dated September 17, 2003 to Erie School District, a copy of which is attached as Exhibit "C." The September 17, 2003

letter is the follow up letter Defendant Stallone stated would be sent to Erie School

District.  In Paragraph 4 of that letter, Defendant Jones on behalf of IMAGE stated:

> The net swaption premium to the District was adjusted to reflect the
> forward starting and option adjusted nature of the swaption, a reasonable
> hedging spread in the LIBOR market and a fee to JPMCB reflective of its
> time and effort dedicated to the District as well as the inherent credit,
> operational and market underwriting hedging risk of the transaction.

> 68.    Further, in Item 5, the IMAGE letter stated:

> To establish the basis for market pricing, we contacted several national
> broker-dealers who have an established industry reputation as to
> competitive providers of the type of swaption transaction contemplated
> herein, and also used specific market data derived from *Bloomburg* and
> other market sources available to us.

> IMAGE then stated:

> Based upon the above circumstances, it is the opinion of IMAGE that the
> terms and conditions of the swaption reflect a fair market value of such
> transaction as of its date.

The foregoing statements in the September 17, 2003 letter were false and were either

known by Defendant Jones to be false and misleading, or were made with reckless

disregard of their truth or falsity, to the extent that Defendant Jones represented that the

fees and/or market spread to be received by J.P. Morgan on the transaction reflected

fair market value since, as set forth above, the fees and/or market spread received were

excessive and reflected anti-competitive activity in the market by both J.P. Morgan and

IMAGE.  Further, the letter falsely represented that the Swaption was fair and

reasonable to Erie School District as of the date of the award.  Defendants Garner and

Stallone were involved in the preparation of and/or had knowledge of the contents of the

letter and the false statements set forth in it.  Defendants Jones, Garner and Stallone

knew the foregoing statements were false, or were reckless in their disregard for their truth or falsity.

69.     The statements set forth above were false and misleading and constitute material misstatements and omissions of material information made by the Defendants, with the knowledge they were false, or with reckless disregard to their truth or falsity, and constituted a scheme or artifice to defraud the Erie School District.

70.     The statements set forth above constituted untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading within the meaning of 17 C.F.R. § 240.10b-5(b).  The statements that J.P. Morgan could not and did not know the total fees and/or market spread it would receive on the Swaption were false since J.P. Morgan had knowledge of the fees and/or market spread it would receive upon the completion of the Swaption.  The statements were misleading because Defendants failed to state the material fact that the fees and/or market spread that would be received by J.P. Morgan were known to J.P. Morgan, IMAGE and the individual Defendants, or were capable of being ascertained in the proper exercise of their respective duties to Erie School District.  The statements were misleading under the circumstances without the further disclosure of such material fact.  The statements by Defendants that the fees and/or market spreads that would be realized on the transaction by J.P. Morgan were based on the market rate were false and misleading because it was not true that the amounts J.P. Morgan would receive reflected the market, and because the statements omitted and failed to state that the JP Morgan fees

and/or market spread were excessive and above the market for a fairly negotiated transaction, and that J.P. Morgan and IMAGE were engaged in a conspiracy and collusive arrangements in the marketplace for municipal Swaptions. The individual Defendants knew the statements were false, or in the alternative, each Defendant acted in reckless disregard of the truth or falsity of these statements.

71. The statements set forth above and J.P. Morgan's act and practice in the course of business of recommending IMAGE as the independent financial advisor for Erie School District and IMAGE undertaking to serve as the independent financial advisor required by the 2003 Debt Act Amendments at the same time that J.P. Morgan and IMAGE were engaged in a conspiracy and anti-competitive, collusive conduct in the marketplace for Swaptions as set forth above constituted an act, practice or course of business by each Defendant which operated as a fraud or deceit upon Erie School District in connection with the Swaption.

72. By his statements set forth above, Defendant DiCarlo stated as a fact that J.P. Morgan's fees and/or market spread were not capable of being calculated in the marketplace as a result of the nature of the transaction. This statement constituted a material misrepresentation of fact because the fees and/or market spread were capable of being calculated in the marketplace.

73. Each of J.P. Morgan, IMAGE, and the individual Defendants knew that the fees and/or market spread that would be received by J.P. Morgan was material to the Erie School District's investment decision, each had a duty to disclose this information accurately, and each failed to do so.

74.     As a result of foregoing statements by all Defendants and in reliance on them, and without knowledge of the true facts regarding JP Morgan's fees and/or market spreads or the collusive activity and conspiracy, Erie School District entered into the Swaption effective September 17, 2003.  Erie School District would not have entered into the Swaption if the material information had been disclosed to it and its representatives.

75.     Erie School District and its Board of Directors relied upon the false statements, false representations, omissions and failures to disclose set forth above.  If Defendants, or any one of them, had disclosed the actual fees and/or market spreads that J.P. Morgan would receive upon the consummation of the Swaption or the collusive, anti-competitive behavior engaged in by J.P. Morgan and IMAGE and the individual Defendants in the marketplace for municipal derivatives, Erie School District never would have entered into the Swaption.  If Defendants, or any one of them, had disclosed that the Swaption was not fair and reasonable for Erie School District as of the date of the transaction, Erie School District never would have entered into the Swaption.

76.     The representations, omissions and concealments set forth above were material because, had the true information been disclosed to Erie School District and its Board of Directors, the information would have been viewed as having significantly altered the total mix of information available to Erie School District upon which to make an informed decision as to whether or not to enter into the Swaption.

77.     As a result of the foregoing false statements and misrepresentations made with *scienter*, upon which the Board members relied, and the concealment of material information from them, the Board was induced to vote in favor of the transaction and for Erie School District to enter into the swaption attached as Exhibit "A."

78.     Based on information and belief, Erie School District avers that Defendant J.P. Morgan received $1,227,415 on the Swaption.

79.     A fair fee and/or market spread for J.P. Morgan for the transaction based on market conditions at the time of the transaction would have been no more than $128,000.

80.     Erie School District has been damaged in the amount of $1,099,415, representing the difference between what it should have received under a properly structured swap transaction as of September 17, 2003 and what was received as a result of the School District being fraudulently induced to enter into the transaction attached as Exhibit "A."

81.     Erie School District has been further damaged as a result of having been induced to enter into the Swaption set forth above.  If Erie School District had not been induced to enter into the Swaption as of September 17, 2003, Erie would have had the opportunity to enter into an appropriate transaction at an appropriate future date involving fair and reasonable fees and/or market spreads  in a marketplace free of collusive, anti-competitive activity.  Erie School District claims damages for the loss of this opportunity which loss was foreseeable to Defendants.

82.     Erie School District did not become aware of the fraud until one of its representatives was contacted by a representative of *Bloomburg News* on October 5, 2007 who asked questions and provided background information as to the fees and/or market spreads received by J.P. Morgan and the fact that such information was available to J.P. Morgan, and was otherwise ascertainable from market information, at the time of the transaction.

83.     Erie School District has incurred expenses in investigating this matter once it became aware of the fraud, including the costs of a qualified financial consultant, legal counsel, other expenses to evaluate the transaction, and similar expenses as a result of other directly related matters arising out of its involvement in the Swaption, all of which expenses were foreseeable to Defendants as a result of their conduct set forth above.

84.     The conduct of J.P. Morgan, IMAGE, and the individual Defendants in this transaction was outrageous, willful and wanton as a result of which conduct Erie School District has been injured as set forth above.  Defendants are liable for punitive damages.

WHEREFORE, Plaintiff Erie School District demands judgment against all Defendants, jointly and severally, in the amount of $1,099,415 together with unliquidated damages, interest, costs, attorneys' fees, expenses and punitive damages.

## COUNT II - FRAUD IN THE INDUCEMENT
### (Plaintiffs v. All Defendants)

85.     Paragraphs 1 through 84 are incorporated by reference.

-24-

86.     By the fraudulent, misleading statements and concealments set forth above, Defendants induced Erie School District to enter into the swaption with J.P. Morgan at excessive fees and/or market spread for J.P. Morgan and very high fees for IMAGE.

87.     As a result of the fraudulent inducement, Erie School District suffered the damages set forth above.

88.     Because of their willful, wanton, and outrageous activities, Defendants are liable for punitive damages in addition to compensatory damages.

WHEREFORE, Plaintiff Erie School District demands judgment against all Defendants, jointly and severally, in the amount of $1,099,415 together with unliquidated damages, interest, costs, attorneys' fees, expenses and punitive damages.


## COUNT III – COMMON LAW FRAUD
### (Plaintiffs v. All Defendants)

89.     Paragraphs 1 through 88 are incorporated by reference.

90.     Under the facts and circumstances set forth above, Defendants committed fraud under the common law by making the false and misleading statements and by failing to disclose the material information as set fort above.  Defendants were under a duty to disclose J.P. Morgan's fee and/or market spread that it would receive under the Swaption when completed, that the Swaption was not fair and reasonable to Erie School District and that Defendants were involved in anti-competitive, collusive activity in the marketplace for Swaptions as set forth above.

91.     J.P. Morgan and IMAGE and the individual Defendants acted with knowledge that their statements were false and misleading, and they made the statements and concealed the information as set forth above with the intention to mislead and defraud Erie School District.  The false, misleading and fraudulent statements and the concealments were material and induced Erie School District to enter into the Swaption transaction.  If J.P. Morgan, IMAGE or the individual Defendants had revealed the true facts, Erie School District never would have entered into the transactions.

92.     J.P. Morgan, with the collusive aid of IMAGE, and by inducing Erie School District to enter into the transaction, engaged in markup fraud.  By concealing the large fee and/or market spread it would receive on the transaction if completed, J.P. Morgan marked up their fee and charged a fee that was grossly excessive and constitutes markup fraud.

93.     As a result of the fraud, Erie School District sustained the losses set forth above.

WHEREFORE, Plaintiff Erie School District demands judgment against all Defendants, jointly and severally, in the amount of $1,099,415 together with unliquidated damages, interest, costs, attorneys' fees, expenses and punitive damages.

## COUNT IV – BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (Plaintiffs v. J.P. Morgan and IMAGE)

94.     Paragraphs 1 through 93 are incorporated by reference.

95.     At all times, Defendants J.P. Morgan and IMAGE were under an implied duty of good faith and fair dealing in their contractual relationships with Erie School District.

96.     By the schemes and artifices set forth above, Defendants breached their implied duty of good faith and fair dealing with Erie School District and instead dealt with Erie School District and its Board malevolently, for their own improper gain, as part of a purposeful scheme designed to deprive the Erie School District of the benefits of the contracts.

97.     J.P. Morgan's implied covenant of good faith and fair dealing required J.P. Morgan to charge only a reasonable, fair fee for their services in the Swaption, and IMAGE's duty required it to advise Erie School District that a reasonable fee for J.P. Morgan would be no more than $128,000, and the Swaption as proposed was not fair and reasonable to Erie School District.

98.     Defendants were under a duty of candid disclosure of all material information, rather than making the false and misleading statements set forth above and concealing other material information.

99.     As a result of Defendants' breach of their implied covenant of good faith and fair dealing, Erie School District did not receive the benefit of the contract that they should have received and instead received only $755,000.  Erie School District should

have received the sum of $1,854,415.  Therefore, Erie has been damaged in the amount of $1,099,415.  Additionally, Erie School District sustained the other consequential damages set forth above.

100.   If Erie School District had not been induced to enter into the Swaption as of September 17, 2003, Erie would have had the opportunity to enter into an appropriate transaction at an appropriate future date that would have resulted in a greater return to the school district on a properly structured transaction involving fair and reasonable fees and/or market spreads  in a marketplace free of collusive, anti-competitive activity for which damages are claimed.

WHEREFORE, Plaintiff Erie School District demands judgment against Defendants in the amount of $1,099,415 together with unliquidated damages, interest, consequential damages and costs of suit.

## COUNT V – BREACH OF CONTRACT
### (Plaintiffs v. IMAGE)

101.   Paragraphs 1 through 100 are incorporated by reference.

102.   At all times, under its agreement to serve as the independent financial advisor, IMAGE owed a contractual obligation to be loyal to Erie School District and to act in good faith and to deal fairly with the School District in carrying out its contractual obligations.  By the schemes and artifices set forth above IMAGE breached its contractual duties as independent financial advisor to the Erie School District for the Swaption and instead dealt with Erie School District unfairly, without full disclosure of

the collusive activity that was being engaged in by IMAGE, J.P. Morgan and others in the Swaption market.

103.   IMAGE was under a contractual duty to properly advise Erie School District regarding all aspects of the Swaption and to advise Erie School District that J.P. Morgan's fee and/or market spread were outrageous and were not reasonable or fair fees for J.P. Morgan, and that the Swaption was not fair and reasonable to Erie School District.  Instead of giving the proper advice to Erie School District, IMAGE and Defendants Stallone, Garner and Jones made the false and misleading statements set forth above and participated in concealing the material information relating to J.P. Morgan's fee and/or market spread and the collusive, anti-competitive activity.

104.   As a result of IMAGE's breach of its duties under its agreement with Erie School District, Erie School District entered into the Swaption.

105.   As a result of IMAGE's breach of contract, Erie has been damaged in the amount of $1,099,415 for the loss of the additional amount they should have received under the Swaption, plus consequential damages, including the loss of the opportunity to enter into an appropriate transaction at a future date as set forth above, and the costs of investigating the other fees and expenses set forth above.

106.   If Erie School District had not been induced to enter into the Swaption as of September 17, 2003, Erie would have had the opportunity to enter into an appropriate transaction at an appropriate future date that would have resulted in a greater return to the school district on a properly structured transaction involving fair and reasonable fees

and/or market spreads in a marketplace free of collusive, anti-competitive activity for which damages are claimed.

WHEREFORE, Plaintiff Erie School District demands judgment against IMAGE in the amount of $1,099,415 together with interest, consequential damages, expenses and costs.

## COUNT VI – CIVIL CONSPIRACY
### (Plaintiffs v. All Defendants)

107. Paragraphs 1 through 106 are incorporated herein by reference.

108. Based on information and belief, Erie School District avers that J.P. Morgan, IMAGE and the individual Defendants were involved in a civil conspiracy whereby they worked together in a collusive manner to inflate the fee and/or market spread that would be received by J.P. Morgan and generate fees for IMAGE on transactions of this type, including the specific transaction at issue.

109. As a result of the conspiracy, Erie School District entered into the transaction which they would not have entered into but for the civil conspiracy.

110. As a result of the civil conspiracy, Erie School District has suffered the losses and damages set forth above.

WHEREFORE, Plaintiff Erie School District demands judgment in its favor and against Defendants J.P. Morgan and IMAGE in the amount of $1,099,415 together with unliquidated damages, interest, costs, expenses and punitive damages.

## COUNT VII – BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. IMAGE, Stallone, Garner and Jones)

111.    Paragraphs 1 through 110 are incorporated herein by reference.

112.    By undertaking to serve as the independent financial advisor for Erie School District as required by Pennsylvania law, IMAGE and Defendants Stallone, Garner and Jones were under a fiduciary duty of loyalty to act solely in the best interests of Erie School District.

113.    By the acts and conduct set forth above, IMAGE and Defendants Stallone, Garner and Jones breached their duty of loyalty to Erie School District, and their duties to provide proper, independent financial advice to Erie School District, including the following:

a.    Failing to disclose the collusive, anti-competitive conduct and conspiracy between Defendants as set forth above and their conflicts of interest;

b.    Failing to inform Erie School District of the total fee and/or market spread that would be realized by J.P. Morgan upon completion of the Swaption;

c.    Failing to thoroughly evaluate the Swaption in order to determine the total amount of fee and/or market spread to be received by J.P. Morgan under the Swaption and to fully inform Erie School District of the total fee and/or market spread that would be realized by J.P. Morgan on the Swaption, such information being readily available to a reasonably prudent investment advisor;

d.    Failing to advise Erie School District that the Swaption transaction proposed by J.P. Morgan was not fair and reasonable to Erie School District as of the date of the award;

e.    Failing to advise Erie School District that it could receive a greater net financial return for the School District by insisting on a lower total fee and/or market spread to be received by J.P. Morgan or engaging in alternative strategies, such as obtaining alternative proposals from other investment banks or bidding; and

f.    Failing to advise Erie School District that it should not enter into the Swaption and instead should wait for an appropriate time and an appropriate transaction that would provide a greater overall return to Erie School District, or to wait until a bond refinancing could occur.

114.    As a result of the breach of fiduciary duty, Plaintiffs suffered the damages set forth above.

WHEREFORE, Plaintiff Erie School District demands judgment in its favor and against IMAGE, Stallone, Garner and Jones, jointly and severally, in the amount of $1,099,415, together with unliquidated damages, interest, costs, attorneys' fees, expenses and punitive damages.

### COUNT VIII – NEGLIGENCE
### (Plaintiffs v. IMAGE)

115.    Paragraphs 1 through 114 are incorporated herein by reference.

116.    At all relevant times, IMAGE, under its agreement to serve as the independent financial advisor to Erie School District, was under a duty to fulfill its obligation and responsibilities consistent with the standards for a reasonably prudent

investment manager with a high level of expertise relating to swaps and related derivative products.

117.    At all relevant times, Defendants Garner, Stallone and Jones were acting as employees, agents and servants for IMAGE, and IMAGE is liable for their negligence.

118.    IMAGE, through its agents, servants and employees, was negligent in carrying out its duties as Erie School District's independent financial advisor in the following respects:

      a.    Failing to inform Erie School District of the total fee and/or market spread that would be realized by J.P. Morgan upon completion of the Swaption;

      b.    Failing to thoroughly evaluate the Swaption in order to determine the total amount of fee and/or market spread to be received by J.P. Morgan under the Swaption and to fully inform Erie School District of the total fee and/or market spread that would be realized by J.P. Morgan on the Swaption, such information being readily available to a reasonably prudent investment advisor;

      c.    Failing to advise Erie School District that the Swaption transaction proposed by J.P. Morgan was not fair and reasonable to Erie School District as of the date of the award;

      d.    Failing to advise Erie School District that it could receive a greater net financial return for the School District by insisting on a lower total fee and/or market spread to be received by J.P. Morgan or engaging in alternative

strategies, such as obtaining alternative proposals from other investment banks or bidding; and

e.    Failing to advise Erie School District that it should not enter into the Swaption and instead should wait for an appropriate time and an appropriate transaction that would provide a greater overall return to Erie School District, or to wait until a bond refinancing could occur.

119.    As a result of the negligence of IMAGE, Erie School District suffered the losses set forth above.

WHEREFORE, Erie School District demands judgment in its favor and against Defendant, IMAGE, in the amount of $1,099,415, together with unliquidated damages, interest, costs, attorneys' fees and expenses.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By___s/James P. DeAngelo_____
         James P. DeAngelo
         I.D. No. 62377
         Delano M. Lantz
         I.D. No. 21401
         100 Pine Street
         P.O. Box 1166
         Harrisburg, PA 17108-1166
         Phone:  (717) 232-8000
         Fax:  (717) 237-5300

Attorneys for Plaintiffs

Dated:    August 29, 2008